412 P.2d 96

George WISE and Eunice Wise, husband
and wife, Appellants,

v.

Merrill KNAPP and Edith Knapp, husband
and wife, Appellees.*

No. 2 CA–CIV 84.

Court of Appeals of Arizona.

March 16, 1966.

Rehearing Denied April 29, 1966.

Review Denied June 7, 1966.

Nasib Karam, Nogales, for appellants.

William E. Hildebrandt, Tucson, for ap-
pellees.

JOHN A. McGUIRE, Superior Court
Judge.

This is an action to quiet title to a portion
of lot J of Potrero Acres Subdivision lo-
cated on the outskirts of Nogales, Arizona,
and for damages for trespass to this land,
brought by the plaintiffs, Merrill Knapp and
Edith Knapp, husband and wife, against
George Wise and Eunice Wise, husband
and wife, defendants.

Defendants cross-claimed asking that
their title be quieted to certain property.
The claims of the parties overlapped in cer-
tain areas of lot J. Plaintiffs recovered
judgment in their favor quieting title to
most of the area of overlapping claim. The
defendants appealed from this judgment in-
sofar as the judgment grants areas of con-
flict to the plaintiffs, and insofar as the
judgment fails to grant to them a right-of-
way over a portion of plaintiffs' property.

* This appeal was filed with the Arizona Su-
preme Court and assigned that court's

No. 8176. The matter was referred to
this court pursuant to A.R.S. § 12–120.23.

The evidence is difficult to follow both in the transcript and in the instruments admitted in evidence because of the confusion in directional orientation. Potrero Acres is laid out along the Tucson-Nogales Highway, which in this area runs in a northwest-southeasterly direction. However, presumably because Tucson lies almost directly north of Nogales, in the testimony before the court and in many of the deeds admitted in evidence, the northwesterly direction of the layout of the subdivision is referred to as "north." To further confuse the factual situation from the appellate standpoint, there is a referral throughout much of the oral testimony to points such as "here" or "there" and other unlocated designations.

We state the facts as revealed by this ambivalent record in the light most favorable to the court's judgment below. All of lot J, the lot in question, originally belonged to one Tomlin. It is an "L" shaped piece of property, with 235.2 feet of frontage on the Tucson-Nogales Highway, 400 feet in depth and 450 feet across the back. We provide the reader with a sketch of lot J so that this opinion may be followed.

In 1930, Tomlin conveyed 100 feet of the "southern" frontage (and we deliberately fall into the same directional disorientation as the witnesses for ease of expression) to one Sawyer, from whom plaintiffs deraigned title. The land so conveyed is designated as parcel A–1 on the sketch above, and measures 315 feet across the rear of the property and extends in depth to the entire 400 feet.

In 1929, Tomlin conveyed the "north" 130 feet of the "northern" frontage along the highway to Adams, which tract ran back 235 feet. Record title to this land later passed to the defendants through one Peterson. The triangular-shaped parcel B–1 in the sketch is a portion of this tract.

Finally, in 1936, Tomlin conveyed the tract immediately in back of the tract conveyed to Adams with dimensions of 130 feet by 165 feet to the same Peterson through whom the defendants acquired their title. Parcel B–2 is a portion of this tract. It is to be noted that Tomlin never conveyed the 5.2 foot strip (parcel A–2 on the sketch) running between these properties. The judgment quieted title to all of lot J shown on the map, except the shaded portion, in the plaintiffs.

There is no question raised on appeal as to the judgment quieting title in the plaintiffs to parcel A–1, with the exception that the defendants claim to be the owners by adverse possession of the area of the driveway as it crosses over A–1 near the Nogales highway. (See preceding sketch.)

The record title to the properties in question is somewhat confusing. Errors in description are common in the instruments admitted in evidence. The record title to parcel B–1 (the elongated triangle) at the time of trial was in the defendants, and the judgment quieting title in the plaintiffs can only be supported on the theory of adverse possession. The title to parcel B–2 is more complex. In 1948, one Herbert, who had acquired title to substantially all of B–2 from the Peterson mentioned above, conveyed to the plaintiffs by bargain and sale deed all of "A–1" plus an area 100 feet wide and 400 feet long lying to the "north" of "A–1," covering the 5.2 strip (to which Herbert did not have record title), and including B–2 (as to which Herbert *did* have record title except as to a small portion). Subsequently, in 1949, the same Herbert executed a quitclaim of A–1 to the plaintiffs, but not including in the description the 100 feet "north" of A–1. The defendants choose to regard this later deed as a "correction deed," thus voiding the 1948 conveyance of B–2, which view is, of course, contested by the plaintiffs who contend that the first deed is a perfectly valid conveyance of most of the B–2 area. There was admitted in evidence, without objection, a quitclaim executed after the filing of this action from Herbert to the plaintiffs of that portion of B–2 to which Herbert did have record title, assuming that he did not divest himself of same by the earlier 1948 deed to the plaintiffs. Defendants, on the other hand, in 1959 obtained a deed from Peterson which covered, inter alia, all of B–2, but, as previously indicated, Peterson did not at that time have record title to B–2 (with the exception of a very small portion thereof). This confusion in record titles is not critical to the decision rendered here because of this court's holding that the trial court's decision is supported by the law pertaining to adverse possession.

The following large-scale sketch brings into focus the areas of conflict and we hope will be helpful in following the remaining portion of this decision. The solid line in the sketch is that set forth in the judgment and the dashed line indicates the description set forth in the 1936 deed from Peterson to Herbert and in the 1961 deed from Herbert to the plaintiffs.

The evidence pertaining to adverse possession controls our decision. Plaintiffs had acquired title to tract A–1 in 1948, but had been in possession thereof since 1942 under an agreement of purchase with the owner, Herbert. From 1942 until 1959 the property to the "north" was owned and occupied by Peterson, the defendants immediate predecessor in title. The exact location on the ground of their respective record titles was unknown to the parties. Both assumed that the roadway around which this action revolved went back at right angles to the highway in a "westerly" direction, while, in fact, it actually drifted to the "north." At all times from 1942 until shortly prior to the commencement of this litigation there was a fence, wall and hedge combination, running along a line north of the roadway which separated the properties on the ground. This is the line selected by the trial court as the legal boundary. Both the plaintiffs and Peterson, and subsequently, the defendants, believed this physical delineation on the ground to be the true boundary, until the defendants acquired a survey sometime in 1960, which survey precipitated this boundary dispute. There were no gates, openings or breaks in this separating line, excepting at the garage, where the fence was connected to the garage on each side, and excepting for one or two "panels" in the fence in the B–2 area, which could be removed by removing wires holding the "panels" in place. These panels were used by defendants on two or three occasions during the 1942–1960 period to permit well drilling equipment to come down the driveway on plaintiffs' side of the fence and onto defendants' land to the rear for well drilling operations. The fence line which the parties thought was on the boundary line actually commenced at a point three-tenth's of a foot "north" of the 5.2 foot "no-man's-land" and ran back at an angle so that at a distance of 235 feet from the highway, it was actually 29.78 feet "north" of the true "northern" boundary of the 5.2 foot strip. Also, as indicated on the plat, the fence to the "north" of the B–2 area varied somewhat from the metes and bounds description of the pertinent deeds.

The driveway in question was used by the plaintiffs as the only means of access to their home and by their tenants both for business purposes and to have access to certain rent dwellings on lot J. The plaintiffs throughout the period of time in question maintained the driveway. The driveway, as shown by the sketch, is in close proximity to the fence line. Buildings were constructed on the plaintiffs' portion of lot J in close vicinity to the "south" boundary of this road so that it was impractical to move this driveway further "south" and away from the fence. Immediately "north" of this road and in close proximity to the fence line was the power line used to bring power to the plaintiffs and their tenants, but not to the defendants or their predecessors in interest. The plaintiffs and their tenants intermittently but for a substantial portion of the time involved, used the property south of the fence line for poultry raising and, in certain areas of B–2, for gardening. The domestic well for plaintiffs' home and for their tenants was located on B–2, near the "southern" boundary thereof.

The plaintiffs use of the property "south" of the fence line was, however, not completely exclusive, in that Peterson and subsequently, for a short time, the defendants used the driveway in question for access to the garage designated as "G" on the sketch. This garage had apparently been built when lot J was under one ownership and the use of the roadway to get to the garage had apparently not terminated when the titles separated. The history of this use at its inception is not clear, however, the parties ostensibly regarding same as immaterial to the issues of the case.

There is a surprising paucity of evidence directly bearing upon the understanding between the parties as to the use of this driveway by Peterson, considering the length of time involved (1942–1960). Part of plaintiffs' testimony was to the effect that they observed Mr. Peterson using the driveway

but that they did not object because they "wanted to be a good neighbor." In approximately 1957 there was a conversation between the parties and the plaintiffs' version is that it was pointed out to Peterson that he could not get his car in and out of his garage without going over the plaintiffs' property and that Peterson made no response to this statement. According to the plaintiffs there never was any dispute between them and Mr. Peterson concerning the use of the driveway. There was testimony that at about this same time Mr. Peterson offered to purchase parcel B-2 from the plaintiffs.

After Peterson moved off the property and the defendants took up occupancy therein, the defendants closed off the doorway to garage "G" with corrugated iron and ceased using the driveway. Immediately after obtaining the survey in 1960, the defendants contacted the plaintiffs and informed them that the survey established that their previous idea that the driveway was on the boundary was erroneous and a demand was made that the plaintiffs recognize the survey as being the true boundary between the properties, which the plaintiffs refused to do.

There is very little else in the record to go on as to whether the plaintiffs were occupying up to the fence line under a claim of right and as to whether the defendants and their predecessors were using the driveway with the implied consent of the plaintiffs or under a claim of right. The evidence would indicate that each side watched the other's use of the respective properties, in the manner described previously, without protest or objection and without any claim of right made known to the other party.

The exact legal description used by the trial court in its judgment was not introduced into evidence during the trial, and this alleged defect constitutes the appellants' first assignment of error. The statement is made in appellants' brief that after the court had reached a decision upholding in general the plaintiffs' claims, a surveyor was employed by the plaintiffs to provide the legal description which is included in the judgment. This statement is not denied by the appellees in their brief.

The description used by the court is a metes and bounds description which can be readily followed on the exhibits in evidence. It appears to be a description of lines drawn on one of the exhibits (plaintiffs' Exhibit 3) to mark the approximate location of where this fence had been prior to its destruction by the defendants. The appellants have pointed out no variance in this description from this testimony. Under these circumstances, this court sees no error in the court's adopting as its own language a description provided by a surveyor. The wording of judgments is, of course, the responsibility of the trial court, but this court knows of no law forbidding a trial court from using professional assistance in selecting verbiage for a judgment, providing that the judgment reached is supported by the evidence.

We now pass to the critical question of whether there was sufficient evidence for the trial court to determine that the plaintiffs had adverse possession for more than ten years prior to the filing of the action up to the fence-hedge-wall line. As previously indicated, this question is complicated by the fact that the plaintiffs' possession was not entirely exclusive of the defendants and their predecessors in interest because of the use of the driveway.

■ In order to acquire title by adverse possession in this state, such possession must be actual, open and notorious, hostile, under a claim of right, continuous for the statutory period, and exclusive. Rorebeck v. Criste, 1 Ariz.App. 1, 398 P.2d 678 (1965). In this case, the appropriate statutory period is ten years. A.R.S. § 12-526.

In Spillsbury v. School Dist. No. 19, 37 Ariz. 43, 48, 288 P. 1027, 1029 (1930), the Supreme Court said:

"It is suggested that to establish title by adverse possession there must be an actual occupancy of the land, and such use of it as it is ordinarily adapted to.

This court has held that neither actual occupancy nor cultivation nor residence is necessary to constitute actual possession, and that what acts may or may not constitute a possession are necessarily varied, and depend upon the circumstances of the case. Costello v. Muheim, 9 Ariz. 422, 84 P. 906."

In its major aspect, this case presents the classic situation of a mistake of adjoining property owners as to the location of a true boundary, with occupancy up to a fence or a wall mistakenly located off the true boundary. The rule in Arizona under such a factual situation is that a person may acquire title by adverse possession. Trevillian v. Rais, 40 Ariz. 42, 45, 9 P.2d 402, 403 (1932); Rorebeck v. Criste, supra. Under the test of the Spillsbury case, supra, the judgment of the lower court is sustainable, unless the use of the driveway by the defendants and their predecessor in interest, Peterson, forecloses the plaintiffs' possession to the fence line being "exclusive." We hold that it does not.

There remains the question of the easement claimed by the defendants in the driveway. There is no difficulty in holding with the trial court that no easement existed to the "west" of the garage. The evidence establishes only two instances of any use by the defendants and/or their predecessors in interest of this portion of the driveway. This would be insufficient, in the opinion of this court, to prevent the plaintiffs' use of the property from being continuous and exclusive or to establish continuous adverse use by the defendants. A serious problem arises, however, whether an easement exists to the "east" of the garage out to the highway. It must be remembered that the use of this driveway for this purpose was continuous and contemporaneous with the gaining of title of land to the original erroneous boundary line by adverse possession.

The predecessors of defendants used this driveway which, so far as the record shows, was the only way to get from the highway to the garage. The garage opened directly on this driveway. This driveway crossed three separate parcels of land. At the garage it was upon property which according to the record title belonged to the predecessor of defendants. It then crossed the 5.2 foot strip, record title to which remained in Tomlin, the original owner, and finally where it reached the roadway it crossed land deeded to the plaintiffs.

The trial court held, and this court has affirmed, that the passing of the driveway over land deeded to defendants' predecessors but used adversely by plaintiffs, was not enough to stop the plaintiffs from acquiring title by adverse possession. We hold, however, that plaintiffs' adverse possession was subject to the use that defendants and predecessors were actually making of the land.

For at least twenty years, and probably longer, the owners of land on both sides of the boundary treated the land to the north of the boundary, finally decreed by the court, as being a part of defendants' tract, and the land lying to the south as being a part of plaintiffs' tract. The boundary as laid out on the land prevailed over the boundary as technically described in the instruments.

By the same line of reasoning all parties treated the driveway as furnishing the necessary ingress and egress to the garage on defendants' tract for the same length of time. This situation amounts to far more than a neighborly act of permitting another to pass over one's own unenclosed land and hence this case is clearly distinguishable from that of LaRue v. Kosich, 66 Ariz. 299, 187 P.2d 642 (1947).

It must be clearly understood, however, that this use of the driveway is limited to that which existed for many years; in other words, the driving of a passenger type vehicle to and from the highway to the garage. It does not extend to any other use.

To modify the judgment to permit such use will leave the actual condition of the parties the same as they and their predecessors believed them to be over the many years period in which the two sets of owners

got along amicably and the rights of the parties ripened.

The judgment of the Superior Court of Santa Cruz County is modified to grant to defendants the right to use the driveway to drive a passenger type vehicle to and from the highway and into and out of the garage, and as modified is affirmed.

Neither party shall recover costs.

WILLIAM C. FREY, Superior Court Judge, and MOLLOY, J., concur.

NOTE: Judges HERBERT F. KRUCKER and JAMES D. HATHAWAY having requested that they be relieved from consideration of this matter, Judges WILLIAM C. FREY and JOHN A. McGUIRE were called to sit in their stead and participate in the determination of this decision.